**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**October 21, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

KAYCEE TIMKEN; CHRISTINE
HARMS,

     Plaintiffs - Appellants,

v.

SOUTH DENVER CARDIOLOGY
ASSOCIATES, P.C.; TROY
STOCKMAN; JILL HUNSAKER RYAN,

     Defendants - Appellees.

No. 24-1378

JESSICA SWEENEY; ROXIE BLUE;
ERICA BODE; AMBER CANO; JULIE
DETERS-FRANK; KAREN DONELSON;
JENNIFER EDDINS; POLLY
GOODWIN; GABRIEL
HERGENRETER; MARY LOU
HOWARD; GWENN HREN; JOHN
LANSFORD; JAIME MONTGOMERY;
ERIN PHIPPS; KINGA SHELTON;
STEPHANIE SILVERS; PATRICIA
SPOERL; LONI THALHEIMER;
ALISHA TORBECK,

     Plaintiffs - Appellants,

v.

UNIVERSITY OF COLORADO
HOSPITAL AUTHORITY; ELIZABETH
CONCORDIA, in her individual and
official capacities; MARGARET REIDY,
in her individual and official capacities;

25-1005

MICHAEL RANDLE, in his individual and official capacities; JILL HUNSAKER RYAN, in her individual and official capacities; D. RANDY KUYKENDALL, in his individual and official capacities; PATRICIA HAMMON, in her individual and official capacities; RAYMOND ESTACIO, in his individual and official capacities; DANIEL PASTULA, in his individual and official capacities; SHAWN TURK, in his individual and official capacities; TOM BUTTS, in his individual and official capacities; EVELINN BORRAYO, in her individual and official capacities; KENDALL ALEXANDER, in her individual and official capacities,

     Defendants - Appellees.

-------------------------------------------------------

AMERICA'S FRONTLINE DOCTORS; DR. SIMONE GOLD, M.D., J.D.,

     Amici Curiae.

_____

**Appeals from the United States District Court**
**for the District of Colorado**
**(D.C. Nos. 1:23-CV-02859-GPG-SBP &**
**1:23-CV-02451-NYW-MDB)**

_____

David Joseph Schexnaydre, Schexnaydre Law Firm, LLC, Mandeville, Louisiana, for Plaintiff-Appellants in 24-1378 and 25-1005.

Lauren Davison, Assistant Attorney General (Philip J. Weiser, Attorney General; Christopher Diedrich, Senior Assistant Attorney General; and Ryan Lorch, Senior Assistant Attorney General, with her on the brief), Office of Colorado Attorney General, Denver, Colorado, for Defendants-Appellees Jill Hunsaker Ryan in 24-1378 and 25-1005, and D. Randy Kuykendall, Patricia Hammon, Raymond Estacio, Daniel Pastula, Shawn Turk, Tom Butts, Evelinn Borrayo, and Kendall Alexander in 24-1378.

Abraham James Spung (Tessa Frances Carberry, with him on the brief), Husch Blackwell LLP, Denver, Colorado, for Defendant-Appellees South Denver Cardiology Associates, P.C., and Troy Stockman in 24-1378.

Christopher M. Jackson (Andrew C. Lillie and Nicholas W. Katz, with him on the brief), Holland & Hart LLP, Denver, Colorado, for Defendants-Appellees University of Colorado Hospital Authority, Elizabeth Concordia, Margaret Reidy, and Michael Randle in 25-1005.

Simone Gold, M.D., J.D. and David A. Dalia, New Orleans, Louisiana, filed an Amici Curiae Brief of America's Frontline Doctors and Dr. Simone Gold, M.D., J.D in 25-1005.

_____

Before **TYMKOVICH**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

South Denver Cardiology and the University of Colorado Hospital Authority fired Jessica Sweeney, Kaycee Timken, and their co-appellants for not complying with COVID-19 vaccination policies. Those policies, enacted almost a year after the FDA gave temporary authorization for the first COVID-19 vaccines, required all employees either to get vaccinated or to receive a medical or religious exemption. Timken and Sweeney declined vaccination: they did not want to receive drugs that were unlicensed and still undergoing the FDA's full review process.[1] And since they did not seek exemptions, their employers held them in violation of the policies and fired them.

---

[1] We use the last names of the lead appellants throughout this opinion to refer to them and their co-appellants.

Timken and Sweeney led separate lawsuits against their former employers. They allege nearly identical breaches of their statutory, constitutional, and contractual rights. Their core argument is that the U.S. Constitution and a set of federal statutes, regulations, contracts, and even a treaty, give them the right—enforceable under 42 U.S.C. § 1983—to refuse unlicensed drugs without risking their jobs. The district court in each case dismissed the complaints, finding Timken and Sweeney had not adequately pled a ground for relief on any of their claims.

Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM.** A plaintiff asserting that a statute confers a § 1983-enforceable right must show that the statute does so unambiguously. Despite offering an assortment of statutes and other authorities, Timken and Sweeney fail to identify any language satisfying that test. And their constitutional and state-contract pleadings likewise fail to assert any other viable legal ground for relief.[2]

Accordingly, the district courts were correct to grant the defendants' motions to dismiss.

---

[2] Courts in other jurisdictions have decided that similar claims lack sufficient legal grounds for relief. *E.g.*, *Boyd v. Shriners Hosp. for Child.*, No. 1:23-342, 2024 WL 5263009 (W.D. Pa. Dec. 31, 2024). And the Courts of Appeals for the Fifth and Ninth Circuits have affirmed dismissals of claims that are nearly identical to Timken's and Sweeney's. *Pearson v. Shriners Hosps. for Child., Inc.*, 133 F.4th 433 (5th Cir. 2025); *Curtis v. Inslee*, No. 24-1869, 2025 WL 2827880 (9th Cir. Oct. 6, 2025).

# I.    Background

## A.    Factual History

Responding to COVID-19's spread, in December 2020 the FDA began issuing emergency-use authorizations (EUAs) for several newly developed vaccines. The EUAs allowed healthcare providers to distribute the vaccines, which had yet to go through the full FDA approval process. To facilitate administration, the Centers for Disease Control and Prevention (CDC) created a "Vaccination Program." Under the Vaccination Program, the CDC purchased vaccines directly from the manufacturers and distributed them to healthcare providers free of charge. Any provider wishing to participate had to sign a CDC COVID-19 Program Provider Agreement, which commands compliance with all federal, state, and territorial laws relevant to the vaccines, including applicable EUA requirements.

Jessica Sweeney and her co-appellants worked at the University of Colorado Hospital Authority (UCHA), a Colorado state government agency and component of the larger UCHealth system. In July 2021, UCHA mandated all its employees either get vaccinated against COVID-19 or receive a medical or religious exemption by October 1, 2021. The Colorado Department of Public Health and Environment (CDPHE) similarly believed vaccinating medical workers would help stem the virus's spread. So on August 30th, it issued new healthcare-facility licensing requirements directing vaccination for all facility employees, contractors, and support staff. Those requirements set an October 31st deadline and obligated facility operators to permit religious and medical exemptions. UCHA acknowledged the new

CDPHE requirements but left its earlier October 1st deadline in place. Sweeney and other co-workers sought neither vaccination nor exemption and were fired after the UCHA deadline passed.

Kaycee Timken and Christine Harms worked for South Denver Cardiology Associates (SDCA), a private medical practice in Colorado. On September 8th, a few days after the CDPHE issued its updated licensure requirements, SDCA began requiring its employees either to get vaccinated or receive an exemption. SDCA personnel could get a vaccine from any available source, so long as they complied by September 30, 2021. Like Sweeney, Timken and Harms let the deadline pass without complying and were fired.

## B.    *Procedural History*

The firings led to two separate lawsuits in the District of Colorado; one led by Timken and one by Sweeney. While the parties differed, the claims were nearly identical. Both Timken and Sweeney sued their respective employers and members of the CDPHE alleging ten claims, including federal claims under 42 U.S.C. § 1983, state-law breach-of-contract and tort claims, and an implied private right of action under the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 360bbb-3.

The defendants in both cases moved to dismiss on various grounds, including state sovereign immunity, qualified immunity, and failure to state a claim upon which relief can be granted. The district court decided Sweeney's case first and dismissed every claim. First, it held Sweeney's claims against government employees in their official capacities were barred by the Eleventh Amendment. Next, it determined the

6

state-law tort claims were blocked by the Colorado Governmental Immunity Act, which prevents tort actions against state employees in most circumstances. Finally, the court dismissed the official-capacity § 1983 claims, the breach-of-contract claim, and the implied right of action claim under Fed. R. Civ. P. 12(b)(6). Upon issuing its order, the court immediately entered judgment and closed the case without giving Sweeney an opportunity to amend her complaint. Sweeney then attempted to reopen under Fed. R. Civ. P. 59(e), but the court denied the motion.

A different judge ruled on Timken's case. The district court similarly dismissed Timken's individual-capacity claims against the CDPHE Director due to state sovereign immunity. It then rejected all of Timken's § 1983 claims against SDCA and its chief executive because Timken had not adequately alleged that they acted "under color of state law."[3] 42 U.S.C. § 1983. The court then explicitly adopted the reasoning from *Sweeney* to dismiss the remaining federal claims against the CDPHE Executive Director under Rule 12(b)(6). Finally, with the federal claims dispatched, the court declined to exercise supplemental jurisdiction over the remaining state law issues. As in *Sweeney*, the court delivered its decision and immediately entered judgment.

---

[3] Timken challenges this ruling on appeal and spends much of her opening brief arguing that SDCA and its CEO were state actors subject to § 1983 claims. But we do not reach that issue because the claim fails for independent reasons. We must review Timken's identical § 1983 allegations against SDCA's co-defendant, CDPHE executive director Jill Hunsaker Ryan. And since we affirm the district court's dismissal of those claims on the merits, Timken's claims against the SDCA defendants fail for the same reasons, independent of the state-action question.

7

## II.    Discussion

Timken and Sweeney both appealed the district courts' judgments dismissing their § 1983 claims.  Sweeney alone appeals the court's dismissal of her breach-of-contract claim.  And both parties appeal the courts' closures of their cases without first providing an opportunity to amend their complaints.

We review a dismissal under Rule 12(b)(6) de novo.  *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).  In doing so, "[w]e accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiff]."  *Id.*  It is not our role "to weigh potential evidence . . . but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### A.    *Section 1983 Claims*

#### 1.    *Legal Framework*

Section 1983 provides a cause of action for violations of federal rights by a person or entity acting under color of state law.  42 U.S.C. § 1983.  The violated right can have its source in either the "Constitution" or "laws" of the United States.  *Id.*  Timken and Sweeney alleged six § 1983 claims, some statutory and others constitutional.

When a § 1983 cause of action rests upon a federal statute, we first ask whether the statute "secures an enforceable right, privilege, or immunity, and does

not just provide a benefit or protect an interest." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2229 (2025). "[T]he statute must display an unmistakable focus on individuals like the plaintiff," and the plaintiff must prove the statute "*clearly and unambiguously* uses rights-creating terms." *Id.* (citation modified) (emphasis added). The Supreme Court cautions that the test is "stringent and demanding" and it is "rare" for a statute to meet it. *Id.* We "employ traditional tools of statutory construction to assess" whether a statute unambiguously confers an enforceable right. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023).

Even when a statute passes this high bar, a "defendant may defeat the presumption by demonstrating that Congress did not intend that § 1983 be available to enforce those rights." *Id.* at 186 (citation modified). We look to the statute creating the right for evidence of that intent. *Id.* The statute may expressly forbid § 1983's use, or it may do so implicitly "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (citation modified). Thus, a statute can "displace[] § 1983's general cause of action with a more specific remedy." *Medina*, 145 S. Ct. at 2229.

### 2. Statutory § 1983 Claims

With these principles in mind, we turn to Timken's and Sweeney's statutory § 1983 claims.

Sweeney identifies three statutes she thinks confer an enforceable federal right: (1) the Emergency Use Authorization (EUA), (2) the Public Readiness and

9

Emergency Preparedness (PREP) Act, and (3) a provision of Title 10 governing human subjects research. Sweeney contends they each confer a right to "legally effective informed consent." Sweeney's Opening Br. 49–58.

Timken claims the same legal sources provide a right against "subject[ion] to investigational drug use." Timken's Opening Br. 32. Both arguments fail because none of the identified sources confer any federally enforceable right.[4] We analyze each in turn.

### a.    Emergency Use Authorization

In most circumstances, a drug, medical device, or biological product must be approved and licensed by the Food and Drug Administration before it may be introduced into interstate commerce. *See* 21 U.S.C. §§ 355, 360(k), 360b, 360e. But during a public health emergency, the EUA statute empowers the Secretary of Health

---

[4] Timken and Sweeney, in background sections of their briefs, also discuss the CDC Provider Agreement, the Federalwide Assurance program, a 1978 Department of Health and Human Services publication called the Belmont Report, regulations contained in 45 C.F.R. pt. 46, and the International Covenant on Civil and Political Rights Treaty. They argue that these sources, sometimes independently and sometimes through their interdependencies, confer federal rights enforceable by § 1983. To the extent those musings can be understood as attempts to revive arguments from the district court proceedings, we do not consider them. In their motions to dismiss, the defendants challenged those sources as incapable of conferring § 1983-enforceable rights because they are not federal statutes. The appellants did not contest those arguments in their replies to the motions, and the district courts deemed them either conceded or abandoned. Timken and Sweeney do not argue that the district courts were wrong to do so, and arguments abandoned below are waived on appeal. *Paycom Payroll, LLC v. Richison*, 758 F.3d 1198, 1203 (10th Cir. 2014) (holding that when a "theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it").

10

and Human Services to temporarily authorize unapproved and unlicensed products. *Id.* § 360bbb-3. The statute is directed at the Secretary of HHS; it confers powers and conditions their exercise. For this reason alone, Sweeney's and Timken's claims fail. But in any event, neither Sweeney nor Timken point to language that "*unambiguously* confer[s] individual federal rights." *Medina*, 145 S. Ct. at 2233 (quoting *Talevski*, 599 U.S. at 180).

First, Timken and Sweeney claim the statute gives potential recipients of EUA-drugs the right to refuse them, as well as the right to be informed that refusal may result in being fired. That subsection requires the Secretary of HHS to establish conditions "designed to ensure individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product [and] the consequences, if any, of refusing." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). Timken and Sweeney argue that an employer cannot obstruct these rights by imposing a vaccine requirement.

We disagree. The statute does not display "an unmistakable focus on individuals like the [appellants]." *Medina*, 145 S. Ct. at 2229. As the district court recognized, the statute governs the relationship between the medical provider and the person receiving an EUA drug. *See Sweeney v. Univ. of Colo. Hosp. Auth.*, No. 23-CV-02451-NYW-MDB, 2024 WL 3713835, at *6 (D. Colo. July 12, 2024). It is silent on the interaction between an employer and an employee who receives or refuses a vaccine. So while the Secretary must set conditions for a vaccine

11

administrator to inform a recipient that he may decline the vaccine, the statute says nothing about limits on an employer's vaccination policy.

Further, the statute lacks the "unambiguous . . . rights-creating terms" required for a § 1983-enforceable right. *Medina*, 145 S. Ct. at 2229. In fact, the EUA provision never mentions rights, privileges, or immunities; it speaks of "benefits" only of an EUA drug's positive therapeutic effects. *E.g.*, 21 U.S.C. § 360bbb-3(c)(2)(B) (discussing "the known and potential benefits of the product . . . [for] diagnos[is], prevent[ion], or treat[ment]" in relation to "the known and potential risks of the product").

Sweeney and Timken focus on a subsection of the statute labeled "Conditions of Authorization" that directs the Secretary to establish "[a]ppropriate conditions" to inform potential recipients of their "option" to accept or refuse an EUA drug. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). Contrast this with the Federal Nursing Home Reform Act (FNHRA), the statute the *Talevski* Court held unambiguously conferred rights on nursing home residents. 599 U.S. at 172. The relevant FNHRA provisions reside in 42 U.S.C. § 1396r(c), which concerns "[r]equirements relating to *residents' rights*." *Id.* at 184. That subsection's subordinate clauses are riddled with language focused on residents' rights, such as "*[t]he right* to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the *resident's* medical symptoms." *Id.* (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii)). Another provision discusses "transfer and discharge *rights*." *Id.* at 184–85 (quoting 42 U.S.C. § 1396r(c)(2)).

The *Talevski* Court also pointed out the statute's focus on "the *resident's* welfare . . . the *resident's* health . . . and the *resident's* urgent medical needs." *Id.* at 185 (quoting 42 U.S.C. §§ 1396r(c)(2)(A), 1396r(c)(2)(B)(ii)(I)–(III)).  Unlike the FNHRA's clear emphasis on patients' individual rights, the EUA statute contains only a single, oblique reference to a potential recipient's "option" to decline.  And that "option" only comes up within a statutory subsection focused on the Secretary's power to grant emergency authorizations.  Whatever one might infer from the EUA language, it does not explicitly create any discernable individual right, let alone the rights to informed consent and investigational drug refusal that Timken and Sweeney assert.

Since the EUA statute does not use "clear and unambiguous rights-creating language," it cannot support a private suit under § 1983.

### b.    PREP Act

Timken and Sweeney turn next to the PREP Act.  42 U.S.C. § 247d-6d.  The PREP Act provides a liability shield for anyone involved in the development or distribution of countermeasures during a public health emergency.  *Id.* § 247d-6d(a).  And it contains a preemption clause that prohibits state and local governments from interfering with federal law governing covered medical countermeasures.  *Id.* § 247d-6d(b)(8).  Timken and Sweeney argue that prohibition forbids interference with "the statutory right to refuse such countermeasures under [the] EUA."  Sweeney's Opening Br. 54.  This argument fails for two reasons.

13

First, the preemption clause does not confer any individual rights enforceable via § 1983. The statute's primary function is to immunize the manufacturers and administrators of covered medical countermeasures during a public health emergency as declared by the Secretary of HHS. *See* 42 U.S.C. § 247d-6d(a)(1). Absent willful misconduct, parties involved in the development, production, distribution, and administration of a drug covered by the PREP Act are shielded from liability for any injuries to recipients. *Id.* §§ 247d-6d(a)–(c). The preemption clause prohibits state and local governments from creating or enforcing any law that conflicts with the PREP Act's liability provisions and relates to the covered countermeasure. *Id.* § 247d-6d(b)(8). It lacks rights-enforcing language and does not refer, in any way, to covered countermeasure recipients.

Timken and Sweeney counter by arguing that the preemption clause incorporates the right to refuse a covered countermeasure articulated in the EUA statute. But as we discussed above, the EUA statute creates no such right and, therefore, cannot support a § 1983 claim—either on its own or through the PREP Act.

Timken and Sweeney also argue that the preemption clause incorporates a voluntariness requirement in the next PREP Act section. That provision requires the Secretary to ensure, in part, that potential countermeasure recipients are "educated with respect to contraindications, the voluntary nature of the program, and the availability of potential benefits and compensation under this part." *Id.* § 247d-6e(c). Timken and Sweeney believe the preemption clause precludes a state or local government from imposing a vaccine mandate on its employees because doing so

would obviate the federal voluntariness requirement in § 247d-6e(c). But again, taking the Supreme Court's instructions in *Talevski* and *Medina*, § 247d-6e(c) fails to reach the high bar for unambiguous rights-enforcing language. And even if it did confer an individually enforceable right, a state or local law that contradicts § 247d-6e(c) falls outside the preemption clause, which, by its terms, only applies to legal requirements contradicting § 247d-6d. *Id.* § 247d-6d(b)(8)(A) (preempting state and local law that "is different from, or is in conflict with, any requirement applicable under *this section*" (emphasis added)). Thus, the PREP Act's preemption clause does not create any right that may be vindicated under § 1983.

Second, even where the PREP Act confers enforceable rights, it prescribes a specific enforcement mechanism that precludes a § 1983 claim. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005) (explaining that the presumption of a § 1983-enforceable right can be rebutted by "the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" (quoting *Blessing v. Firestone*, 520 U.S. 329, 341 (1997)). The statute asserts that the "sole exception" to its immunity grant is an "exclusive Federal cause of action . . . for death or serious physical injury proximately caused by willful misconduct." *Id.* § 247d-6d(d)(1). The next subsection details the necessary procedures and the available remedies. *See id.* § 247d-6d(e). A general § 1983 cause of action like the one Timken and Sweeney are advocating would frustrate this scheme. If any party that suffered a hardship other than death or serious physical injury could bring a claim under § 1983, the

15

PREP Act's remedial mechanism would be just one of many exceptions to the statute's liability shield, not the sole exception.

Since neither Timken nor Sweeney claims they suffered serious physical injury, they do not have a cause of action under the statute. If they did, the PREP Act would channel that claim through its own enforcement mechanism, thereby precluding a § 1983 cause of action. And since the PREP Act confers no other individually enforceable rights, Timken and Sweeney lack a viable § 1983 claim.

### c. 10 U.S.C. § 980

The next statutory claim runs through 10 U.S.C. § 980, which governs how the Department of Defense may spend money on research involving human subjects. The relevant portions of that enactment provide that:

> **(a)** Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless—
>
> **(1)** the informed consent of the subject is obtained in advance; or
>
> **(2)** in the case of research intended to be beneficial to the subject, the informed consent of the subject or a legal representative of the subject is obtained in advance.

10 U.S.C. § 980(a). The district courts correctly dismissed this claim because neither Timken nor Sweeney alleged that any DoD funds were used to experiment on them or explained how the defendants would be responsible if they had been.

Further, this statute, like the EUA statute and PREP Act, lacks rights-conferring language. A plain reading of the statute reveals it for what it is: a condition on how the DoD can spend its appropriations. As discussed below, the normal remedy for a violation of this kind of condition is revocation of the funding.

*Medina*, 145 S. Ct. at 2228 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002)). The reference to securing "the informed consent of the subject" falls far short of the unambiguous language required to support a § 1983-enforceable right.  10 U.S.C. § 980(a)(1).  Timken and Sweeney do not offer an alternative interpretation—just a conclusion, unsupported by any legal source, that the statute recognizes an enforceable right.  They have not carried their burden of showing "that [the] statute secures an enforceable right, privilege, or immunity," and the district court was correct to dismiss the claim.  *See Medina*, 145 S. Ct. at 2229.

### 3.    *Constitutional § 1983 Claims*

#### a.    *Fourteenth Amendment – Equal Protection*

Sweeney's next claim is an equal-protection claim based on allegations that the "[d]efendants selectively punished only those individuals who exercised their legal option to refuse [vaccination]."  Sweeney's Opening Br. 59.  She argues all UCHA employees were similarly situated because the EUA statute and CDC Program conferred a choice to receive or to refuse vaccination.  But only employees who did not get vaccinated lost their jobs.  Sweeney argues that by firing her and other unvaccinated employees, the appellees violated their equal protection rights under the Fourteenth Amendment.[5]

---

[5] Timken made a similar argument in the district court but did not raise the issue in her opening brief.  An appellant bears the responsibility of raising her "contentions and the reasons for them."  Fed. R. App. P. 28(a)(8)(A).  Thus, Timken's equal protection argument is waived.  *See United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011).

The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "Different types of equal protection claims call for different forms of review. A claim that a state actor discriminated on the basis of a suspect (e.g., race), quasi-suspect (e.g., gender), or a non-suspect classification calls for strict, intermediate, or rational basis scrutiny, respectively." *Brown v. Montoya*, 662 F.3d 1152, 1172 (10th Cir. 2011).

Sweeney provides us no guidance on what type of classification she believes UCHA and CDPHE made with their vaccination policies. The district court determined the claim was predicated on vaccination status and that such classification is non-suspect. Applying rational basis review, the district court decided that slowing the spread of COVID-19 is a legitimate interest and that "[r]equiring those who work in a hospital or healthcare facility to take preventative measures against the spread of COVID-19 is easily rationally related to that interest." *Sweeney*, 2024 WL 3713835, at *12. Again, Sweeney does not contest that finding and merely asserts that "[d]efendants engaged in unconstitutional conduct by creating and implementing this discriminatory enforcement scheme against those exercising a legally protected choice." Sweeney's Opening Br. 59.

Conclusory statements of this sort are insufficient. Parties have an obligation to support their arguments with authority. *United States v. Banks*, 451 F.3d 721, 728 (10th Cir. 2006). We have already found that the CDC Provider Agreement and EUA statute do not create individual rights. And Sweeney points to no case or legal source

18

to undercut the district court's reasoning. We therefore decline to consider her equal-protection claim further.

### b.      *Fourteenth Amendment – Due Process*

Timken and Sweeney next allege their employers' vaccine mandates deprive employees of their constitutional due process rights secured by the Fourteenth Amendment. That amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Due process comes in two forms, procedural and substantive. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).

Timken does not address procedural due process in her opening brief, but Sweeney does. Sweeney's argument is that she held a protected property interest in her job and that UCHA, as a public employer, may not deprive her of that interest without giving her an opportunity to be heard. But, she says, UCHA did just that by firing her without providing "a place or time to air [her] complaints." Sweeney's Opening Br. 60. The district court found that Sweeney abandoned her procedural due process claim by failing to respond to the defendants' arguments challenging the claim in their motions to dismiss. Sweeney does not tell us if or how the district

court was wrong to do so.  Thus, Sweeney's procedural due process claim is waived, and we will not consider it.  *See Paycom Payroll, LLC*, 758 F.3d at 1203.

Both Timken and Sweeney appear to argue that they were deprived of rights secured by substantive due process.  Sweeney asserts that "legally effective informed consent" and the option "to refuse unwanted investigational drug treatments" are fundamental rights and any interference with them must leap the high hurdle of strict scrutiny.  Sweeney's Opening Br. 36, 46–47.  Timken seems to make similar allegations, and also asserts that the vaccination policies deprived her of her "fundamental liberty interests of privacy [and] bodily autonomy."  Timken's Opening Br. 47–48.

The district courts acknowledged similar arguments that Timken and Sweeney raised in their responses to the motions to dismiss.  But looking beyond those briefs to the complaints, the courts determined that Timken and Sweeney had not alleged breaches of recognized liberty interests.  Rather, their claims asserted a "right to continued employment . . . without receiving the COVID-19 vaccine."  *Sweeney*, 2024 WL 3713835, at *14.  Since "neither the expectation of employment, nor continued employment, is a fundamental right," the district courts applied rational basis review.  *Id.* (citation modified).  The courts used the same rationale from their equal-protection analysis to find the vaccination policies satisfied rational basis review for the substantive due process claims.

We agree with the district courts' readings of Timken's and Sweeney's complaints.  The relevant paragraphs, which are identical, state:

20

> Defendants' requirement that Plaintiffs inject unlicensed drugs into their bodies as a condition to sell their labor "is not a legitimate exercise of the police power of the State, but an unreasonable, unnecessary and arbitrary interference with the right and liberty of the individual to contract in relation to labor, and, as such, it is in conflict with and void under, the Federal Constitution." *Lochner v. New York*, 198 U.S. 45 (1905).

25-1005 App. vol. 1, at 107; 24-1378 App. vol. 1, at 86. The citation to *Lochner* alone suggests the assertion of a liberty interest to contract freely, rather than an interest in bodily autonomy or informed consent. And nothing in the complaints' text encourages a contrary reading. The district court was right to apply rational basis review. And since Timken and Sweeney cite no authority and make no argument that the vaccination policies are not rationally related to any legitimate government interest, we have no reason to overturn that result.

Alternatively, Sweeney argues that the district court misinterpreted her claim, which, she says, was based on other fundamental rights. But once again, Sweeney's brief is fatally flawed. As evidence that the district court misconstrued her argument, Sweeney points to her post-judgment Rule 59(e) motion. But a motion to dismiss is decided on the pleadings and a post-judgment motion is an inappropriate place to advance a new basis for a claim. *See Smith*, 561 F.3d at 1098 ("The court's function on a rule 12(b)(6) motion is . . . to assess whether the plaintiff's *complaint alone* is legally sufficient to state a claim for which relief may be granted." (emphasis added)). As a result, we treat the substantive due process arguments based on rights other than the alleged right to continued employment as raised for the first time on appeal. And "we generally do not consider new theories on appeal—even those that

21

fall under the same general category as the one that was presented in the district court." *Utah Animal Rts. Coal. v. Salt Lake County*, 566 F.3d 1236, 1244 (10th Cir. 2009). To act otherwise would encourage disappointed litigants to abuse the appellate courts by treating them as forums "where secondary, back-up theories may be mounted for the first time." *Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997). Accordingly, we decline to take up Sweeney's new substantive due process theory.

To conclude, Timken and Sweeney have not adequately contested the district courts' dismissals of the original substantive due process allegations and we do not consider the theories they raise for the first time on appeal.

### c. *Spending Clause*

Timken and Sweeney also allege a deprivation of their rights under the Constitution's Spending Clause. Specifically, they claim the CDC Program, EUA statute, 10 U.S.C. § 980, and 45 C.F.R. § 46.122 were each passed pursuant to Congress's Article I spending power and confer § 1983-enforceable rights that the appellees violated.

The argument belies some confusion about the nature of § 1983 claims. Rather than a "Spending Clause claim," the claim is rightly understood as a § 1983 claim based on a statute passed through the spending power. As discussed already, a statute confers a § 1983-enforceable right only through unambiguous rights-creating language that displays an unmistakable focus on individuals like the plaintiff. *Medina*, 145 S. Ct. at 2229. The Supreme Court developed this standard in a line of

22

cases dealing with spending-power legislation. *Id.* at 2232–34 (tracing the issue's development from *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), to *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), to *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023)).  Indeed, the Court has repeatedly cautioned that legislation passed through the spending power is *more unlikely* to create § 1983-enforceable rights than laws passed under other enumerated powers.  *Id.* at 2230. This is "because spending-power legislation is in the nature of a contract, [and] a grantee must voluntarily and knowingly consent to answer private § 1983 enforcement suits before they may proceed."  *Id.* at 2234.  But that consent cannot be "fairly inferred" absent "clear and unambiguous notice" that the statute creates a § 1983-enforceable right.  *Id.*  Rather, the "typical remedy for state noncompliance with federally imposed conditions [on receipt of federal funds] is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State."  *Gonzaga*, 536 U.S. at 280 (quoting *Pennhurst State Sch. & Hosp.*, 451 U.S. at 28).

The upshot for Timken and Sweeney is that their Spending Clause claims are essentially restatements of their earlier statutory claims.  Since we already examined the relevant legal sources to review those claims, we need not repeat the analysis. Instead, we briefly note that the argument is flawed for the additional reason that neither the EUA statute, the Provider Agreement, nor 45 C.F.R. § 46.122 were passed pursuant to the spending power.  The EUA statute was enacted via Congress's power to regulate interstate commerce.  21 U.S.C. § 360bbb-3(a)(1).  And the Provider

Agreement and 45 C.F.R. § 46.122 are not even statutes. This leaves only 10 U.S.C. § 980, which we interpreted above as not creating a § 1983-enforceable right.

Thus, Timken's and Sweeney's Spending Clause arguments fail, and we affirm the district courts' dismissals of those claims.

### d.   *Unconstitutional Conditions*

Timken's and Sweeney's final § 1983 claims are based on the unconstitutional-conditions doctrine. That doctrine prohibits the government from "deny[ing] a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545 (1983)). A "predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Id.* at 612. The doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.* at 604.

Timken and Sweeney argue that the CDPHE, UCHA, and SDCA vaccination policies unconstitutionally conditioned their continued employment in healthcare on surrendering their due-process and equal-protection rights to refuse investigational drugs. We dealt with the due-process and equal-protection arguments above and found them lacking. Since Timken and Sweeney have not adequately pled a burden on the exercise of their constitutional rights, they have no basis for an unconstitutional-conditions claim.

24

### B.    *Sweeney's Breach of Contract Claim*

Only Sweeney appeals the district court's ruling on the breach-of-contract claim. Sweeney's argument relies on her assertion that UCHA employees were third-party beneficiaries to the CDC Provider Agreements signed by UCHA and the CDPHE. The district court dismissed the claim because Sweeney's complaint merely lists a conclusory set of purported third-party rights that is insufficient to establish that she was an intended third-party beneficiary under Colorado state law.

Sweeney did not adequately raise this issue in her brief, so she waived this claim. The appellant bears the responsibility to craft her arguments; we will not do that for her. *Dodds v. Richardson*, 614 F.3d 1185, 1205 (10th Cir. 2010). Allegations that "fail[] to frame and develop an issue" are insufficient "to invoke appellate review." *Kelley v. City of Albuquerque*, 542 F.3d 802, 819 (10th Cir. 2008). And a party must support its arguments with authority. *Banks*, 451 F.3d at 728.

In just a single paragraph, Sweeney advances her claim that she is a third-party beneficiary under the CDC Provider Agreement. She says the Provider Agreement "provides specific rights" but does not name any. Sweeney's Opening Br. 62. Her brief makes no legal argument to support her third-party beneficiary status, cites no law, and points out no error in the district court's reasoning. On that record, we consider the issue waived and do not review the merits. *See United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir. 1995).

In the same section, Sweeney asserts that the Federalwide Assurance (FWA) agreements between the CDC, UCHA, and CDPHE confer third-party beneficiary rights because the FWA program "exists exclusively to ensure that the signatories obtain an individual's legally effective informed consent."[6]  Sweeney's Opening Br. 62.  But Sweeney's complaint lists the Provider Agreements, not the FWAs, as the basis for her breach of contract claim.  Since the FWA argument is new and was not made before the district court, we deem it waived as well.  *See Utah Animal Rts. Coal.*, 566 F.3d at 1244.

### C.    *Appellants' Request to Amend*

Finally, Timken and Sweeney argue that the district courts erred by ordering their cases closed without first giving them a post-dismissal opportunity to amend their complaints.  We find that the district courts did not abuse their discretion and affirm.

Federal Rule of Civil Procedure 15 governs amendment of complaints.  Under Rule 15(a), a party "may amend its pleading once as a matter of course" within prescribed time limits.  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Absent a request to

---

[6] An FWA is a legally-binding agreement in which "an institution commits to the HHS that it will comply with the requirements in the HHS Protection of Human Subjects regulations at 45 C.F.R. part 46.  *FWAs*, U.S. Dep't of Health & Hum. Servs. (Dec. 15, 2021), https://www.hhs.gov/ohrp/register-irbs-and-obtain-fwas/fwas/index.html.

amend, a district court may dismiss the action rather than sua sponte granting leave to amend." *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1256 (10th Cir. 2024). We review a denial of leave to amend for abuse of discretion. *Id.*

In both suits, the district courts granted the defendants' motions to dismiss and immediately entered judgment. Shortly thereafter, Sweeney filed a motion to alter the judgment under Fed. R. Civ. P. 59(e) which alternatively sought leave to amend her complaint. The district court denied the motion, finding no adequate grounds to set aside the judgment under Rule 59(e). Sweeney does not challenge any other aspect of the Rule 59(e) order, and failure to reopen the case is sufficient grounds to deny the alternative request to amend, since setting aside the judgment is a prerequisite to bringing a post-judgment Rule 15 motion. *See Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1185 (10th Cir. 1999). But the court proceeded to explain that Sweeney's attempt to amend would fail for the additional reason that she did not request to do so at any point during the proceedings.

The court did not abuse its discretion in so ruling. On appeal, Sweeney argues that the district court erred because she was given no opportunity to formally request leave to amend after judgment was entered. She provides no authority for that argument and, regardless, ignores that she could have moved for leave to amend at any point prior to judgment.[7] In *Young v. Colorado Department of Corrections*, we

---

[7] Sweeney's single citation comes in the "Conclusion" section of her brief rather than the body of her argument. But even that case, *Cohen v. Longshore*, 621 F.3d 1311 (10th Cir. 2010), is unhelpful. There, we reversed a district court's

explained that plaintiffs have many opportunities to request leave to amend: they can request leave in a response to a motion to dismiss, in a separate prophylactic filing, or in a post-judgment motion to reconsider a dismissal order. 94 F.4th at 1256. And "[a]bsent a request to amend, a district court may dismiss the action rather than sua sponte granting leave to amend." *Id.*. Sweeney does not say she ever requested leave to amend or that the court should have understood any part of her reply to the motion to dismiss as doing so. Without a formal request to amend in front of it, the district court did not abuse its discretion by entering judgment and ordering the case closed.

Like Sweeney, Timken did not request leave to amend her complaint prior to judgment. But unlike Sweeney, Timken did not file any post-judgment motions. So her argument on appeal is effectively her first attempt to request leave to amend. Typically, this would mean the argument is waived and we would not address it. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Since, however, we have already decided Sweeney's case, we acknowledge Timken's argument would fail for the same reason. Absent a pre-judgment request to amend, the district court had no obligation to withhold judgment and sua sponte grant leave to amend. *Young*, 94 F.4th at 1256. Its choice to issue the judgment and close the case was within its discretion.

---

denial of a plaintiff's pre-judgment request to amend. *Cohen*, 621 F.3d at 1318. But the key issue here is the complete lack of a formal request before judgment.

## III.   Conclusion

For the foregoing reasons, we affirm the district courts' judgments.